# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **HUGH P. RUFFING,** | : | **Case No.1:08-CV-01264** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **MASTERBUILT TOOL & DIE, LLC,** et al., | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |

On May 22, 2008, Plaintiff Hugh P. Ruffing filed a seven-count complaint against Defendants Masterbuilt Tool & Die, LLC ("Masterbuilt"), Red Rock Stamping, LLC ("Red Rock"), and Hawthorn Manufacturing Corporation ("Hawthorn") asserting breach of an employment agreement and related claims. (Doc. 1.) Shortly thereafter, Masterbuilt, Red Rock, and Hawthorn (collectively, "Defendants") filed a motion to dismiss four of these seven counts as to Hawthorn and Red Rock (Doc. 13) and the parties filed cross-motions for judgment on the pleadings with respect to another (Docs. 19, 24). For the following reasons, this Court **GRANTS** Ruffing's motion for judgment on the pleadings with respect to Count I, **DENIES** Masterbuilt's cross-motion on the same, **GRANTS** Red Rock and Hawthorn's motion to dismiss Count III, and **DENIES** Red Rock and Hawthorn's motion to dismiss Counts II, IV and VI.

## BACKGROUND

Although this case is primarily an employment dispute, the relationship of the parties to each other is both complicated and vital to the resolution of the instant litigation. The events giving rise to this litigation seem to have begun in August 2006,

when Hawthorn entered into a Letter of Intent ("LOI") to purchase Red Rock, the company by which Ruffing was employed at the time. (Compl. at ¶8.)  Ruffing alleges that this LOI expressly identified Ruffing as a third-party beneficiary of the promises therein.  (*Id*. at ¶9.)  In support of this contention, he points to the first paragraph of the LOI, which provided that Hawthorn:

> will enter into an employment agreement with Mr. Hugh Ruffing.... the agreement will include a minimum salary of $200,000 for one year and a severance provision of one year salary for Mr. Ruffing.

(*Id*.)  It is undisputed that Hawthorn itself never offered Ruffing any type of employment agreement.[1]  On the other hand, Defendants contend that Hawthorn was under no obligation to do so, because they assert that the LOI did not create any binding obligations on the part of its signatories.  In particular, they argue that the LOI, by its own terms, did not "create any ... obligations."  (Doc. 13 at 6) (quoting the LOI).

Seven months after signing the LOI, on March 5, 2007, Hawthorn purchased Red Rock.  (Compl. at ¶11.)  This was accomplished through an Asset Purchase Agreement ("APA") by which a Hawthorn subsidiary acquired Red Rock.  (Compl. Ex. 2.)[2]  The APA, like the LOI, referrers specifically to Ruffing.  In particular, it obligates Red Rock to offer employment to Ruffing, but also provides that nothing within the APA limits Red Rock's ability to terminate Ruffing after offering him employment.  In pertinent part, the

---

[1] As explained below, however, Ruffing does allege that Masterbuilt was the alter ego of Hawthorn.  Should Ruffing succeed in prosecuting this claim, any claims against Hawthorn would be dismissed to the extent that Masterbuilt fulfilled obligations undertaken by Hawthorn.

[2] As the APA is apparently "four phone books thick," this Court has not seen a full copy of the APA.  Nevertheless, both parties concede that the APA is a binding contract and that the provisions before the Court are the provisions that the parties anticipate will be relevant to this litigation.

APA states:

> [Red Rock] shall offer employment to [Ruffing].... [The] offer of employment [to Ruffing] shall be for at least the substantially similar rate of pay (including salary and bonus), benefits and position as in effect immediately prior to the [execution of the APA]....

> Nothing contained in this ... Agreement shall be construed to prevent the termination of employment of [Ruffing] by [Red Rock] or any change in the rate of pay or employee benefits available to [Ruffing] following Closing....

(Compl. Ex. 2 at ¶ 9.)  Ruffing contends that these provisions compelled Red Rock to at least offer employment to Ruffing, while the Defendants contend that this provision does not create any enforceable obligation on their part – that "Red Rock [had] complete discretion in its decision to employ [the] Plaintiff."  (Doc. 13 at 7.)

Although Red Rock itself did not offer employment to Ruffing, on March 6, 2007, Ruffing was offered a contract with a different Hawthorn subsidiary, Masterbuilt. (Compl. at ¶13,18.)  Masterbuilt seems to be a peculiar entity, as it "was not capitalized, had no banking or checking account, had no assets, and had no employees other than Ruffing."  (*Id*. at ¶16.)  Although Ruffing's contract was with Masterbuilt, it is Red Rock that paid Ruffing's salary and reimbursed Ruffing for his expenses.  (Compl. at ¶28.) Furthermore, Ruffing did not perform any work for Masterbuilt, but rather was instructed to generate business for other companies owned by Hawthorn, including Red Rock.  (*Id*. ¶27.)  It seems that Masterbuilt "never conducted any business … generated no revenues and had no liabilities (other than Ruffing's Employment Agreement.)"  (*Id*. ¶17.)

Ruffing asserts that these unusual features obtain because Masterbuilt was nothing but the alter ego of both Hawthorn and Red Rock.  (*Id*. ¶¶78,79.) ("[Masterbuilt was] a mere shell of a company … [that] did not observe corporate formalities … [and] was

used by Hawthorn and Red Rock to … commit self-dealing and acts of deception.").  It is for this reason that Ruffing argues that both Hawthorn and Red Rock should be held liable for any of Masterbuilt's obligations.  The Defendants respond by asserting that it is never appropriate to "pierce" an Ohio LLC such as Masterbuilt, regardless of any underlying fraud.  (Doc. 13 at 12-13.)[3]  They argue, further, that even if an LLC can be pierced, it is never appropriate to impute liability from one "sister" corporation to another.  Consequently, Defendants maintain that any claim for piercing must be dismissed as to Masterbuilt's "sister," Red Rock.

Notwithstanding any other obligations between or among these parties, it is unquestioned that Ruffing signed a binding contract with Masterbuilt (the "Employment Agreement.")  (*See* Doc. 1 Ex. C.)  Under the terms of the Employment Agreement, Ruffing was paid a base salary of $200,000 each year to serve as President of Masterbuilt.  The Employment Agreement ran for one year and automatically renewed each year if neither party expressly terminated the contract.  In particular, it provided:

**[§2 Term of Employment and Automatic Renewal]**

The term of Executive's employment under this Employment Agreement will commence on the date of this Employment Agreement and will continue until the first (1st) anniversary of the date of this Employment Agreement (the "Initial Employment Period"). The Initial Employment Period and any renewal employment period (as defined herein) shall automatically be renewed and extended on the same terms and conditions contained herein for consecutive one-year periods (each, a "Renewal Employment Period"), unless not later than sixty (60) days prior to the end of the Initial Employment Period or any Renewal Employment Period, as the case may be, either party shall give written notice to the other party of

---

[3] This Court is confused by the degree to which the Defendants' moving papers appear to use the phrase "Michigan law" as a synonym for "bad law."  While this Court is mindful that the law of different jurisdictions may vary substantially, in the absence of binding precedent, the Court will carefully consider well-reasoned opinions from another jurisdiction, even when that jurisdiction is in Michigan.

its election to terminate this Employment Agreement. The Initial
Employment Period and the Renewal Employment Periods are hereinafter
referred to as the "Employment Period." Notwithstanding anything to the
contrary contained herein, the Employment Period is subject to earlier
termination pursuant to Section 12 below.

**[§12(d) Termination by the Company without Due Cause]**

The Company may terminate the Employment Period without Due Cause
upon providing the Executive with written notice of such termination. If
the Employment Period is terminated pursuant to this Section 12(d), then
Executive will be entitled to receive as severance pay the continuation of
his Base Salary at the annual rate then in effect for (i) a period of twelve
(12) months following the termination of his employment, to the extent
Executive's employment is terminated within the Initial Employment
Period, (ii) a period of nine (9) months following the termination of his
employment, to the extent Executive's employment is terminated after the
expiration of the Initial Employment Period but prior to the twenty-four
(24) month anniversary of the date hereof…. Notwithstanding anything to
the contrary set forth in this Section 12(d), in no event will the Executive
receive less than twenty-four (24) months in the aggregate of Base Salary
and/or severance pay, as the case may be, under this Agreement.
Notwithstanding the above, Executive shall receive the amounts set forth
in this Section 12(d) only if Executive is not in material breach of any of
the provisions of Section 10 of this Employment Agreement, and has
complied with Section 12(g) of this Employment Agreement.

(*Id*. at §§2,12(d)) (emphasis added). As Masterbuilt accurately paraphrases the first

paragraph, §2 provides that the contract "will automatically renew if Masterbuilt does not

inform Plaintiff of its election to not renew, *i.e.*, terminate, the Employment Agreement."

(Doc. 24 at 2.) (second emphasis added). The second paragraph appears under the

contract heading "Termination."

On December 17, 2007 (approximately 10 months after the commencement of the

Employment Agreement), Masterbuilt informed Ruffing that his employment was "not

being renewed." Masterbuilt did not contend that Ruffing was in any way in violation of

his Employment Agreement (i.e., did not claim that there was any "cause" for their

5

decision), but did assert that Ruffing was not entitled to any severance because, under §2, it asserted that either party may elect to "non-renew" the agreement.  (*See id*. Ex. D.)  In pertinent part, Masterbuilt stated

> Pursuant to Section 2 of the March 5, 2007 Employment Agreement ... notice is given that the Agreement is not being renewed at the end of the initial term, March 5, 2008.... Note, however, that because your employment will cease due to the nonrenewal of the Agreement, the severance described in Section 12(d) when the employment period is terminated ... is not triggered.

(*Id*.) (emphasis added).   This letter was signed "Greggory A. Notestine, Group President."

As Notestine's letter indicates, Masterbuilt contends that §2 and §12 of the Employment agreement refer to fundamentally different circumstances.  Masterbuilt argues that §2 permits unconditional termination of the contract itself (the "Employment Agreement"), whereas §12 discusses only the consequences flowing from termination of an "Employment Period," i.e., a termination occurring during (but apparently not within sixty (60 days of the end of) the contract term.  Conversely, Ruffing contends that §2 refers to the manner in which the Employment Agreement can be terminated, whereas §12 refers to the consequences flowing from such termination.  Ruffing, consequently, argues that he is entitled to severance under §12 of the Employment Agreement.

Finally, Ruffing, a resident of Arizona, seeks damages under Arizona labor law for what he characterizes as Masterbuilt's wrongful withholding of his final paycheck. (Compl. at ¶43.)  Ruffing also seeks these damages from Hawthorn and Red Rock under the theory of alter ego liability.  Defendants do not contest that Ruffing has pled a valid cause of action against Masterbuilt, but argue that Ruffing cannot sustain a suit against Hawthorn or Red Rock because the relevant Arizona law defines employee to mean "any

6

person who performs services for an employer under a contract of employment" and Ruffing did not have a contract with Hawthorn or Red Rock.  (Doc. 20 at 2.)

The Court generally finds Ruffing's arguments to be well-taken at this stage of the litigation.  First, the appropriate reading of the Employment Agreement is not a close question – Ruffing was terminated pursuant to the Employment Agreement, which expressly provides for a minimum payment upon such termination.  Similarly, the APA expressly provides that Red Rock is to employ Ruffing; the mere fact that the APA does not restrict Red Rock's ability to terminate Ruffing does not modify this obligation. Ruffing is also permitted to pursue his claims asserting that Hawthorn and Red Rock are liable for Masterbuilt's contractual breach because an LLC is not immune from the general law of corporations.[4]  Ruffing, similarly, may pursue recovery for violation of Arizona labor law under an alter ego theory of liability.  On the other hand, Count III is dismissed in its entirety, because the LOI does not create any binding obligations whatsoever.

**STANDARD OF REVIEW**

The Court may dismiss all or part of a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) is directed solely at the complaint itself. *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983) (citing *Sims v. Mercy Hospital of Monroe*, 451 F.2d 171, 173 (6th Cir. 1971).) When evaluating a complaint in light of a motion to dismiss, the Court must accept all of the plaintiff's allegations as true and resolve every doubt in the plaintiff's favor.  *Zaluski v.*

---

[4]  As explained more fully below, the Court also does not accept Defendants' contention that piercing is always inappropriate between sister corporations.

*United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  That said, a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level;" it must contain facts that support a claim for relief that is "plausible on its face."  *Twombly*, 127 S. Ct. 1955, 1965 (2007)).

A claim will be dismissed when it does not "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory . . . ." *Id*. at 1969 (internal citations and quotations omitted, emphasis in original). While the federal rules contain a liberal standard against which pleadings should be measured, "more than bare assertions of legal conclusions are ordinarily required to satisfy the federal notice pleading requirements." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

Finally, "[t]he standard of review applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim is also applicable to a Rule 12(c) motion for judgment on the pleadings." *Trs. of the Bldg. Laborers' Local 310 Pension Fund v. Able Contr. Group*, Inc., No.1:06-CV-1925, 2008 U.S. Dist. LEXIS 64426, at *15 (N.D. Ohio Aug. 19, 2008) (citing *JP Morgan Chase Bank N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir. 2007).)  In other words, "[a] Rule 12(c) motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id*. (citations omitted).  As with a Rule 12(b)(6) motion to dismiss, the complaint is construed "in the light most favorable to the nonmoving party." *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. Ohio 2007).  Still, this Court "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id*.  Documents

attached to the pleadings as exhibits are considered incorporated therein and may be considered in evaluating a Rule 12 (c) motion.  *See* Fed. R. Civ. P. 10(c).  "The Court may consider such exhibits, however, only where the authenticity of such exhibits is not contested."  *In re Commercial Money Ctr.*, No.1:02-CV-16000, 2005 U.S. Dist. LEXIS 45488, at *34-35 *aff'd Commer. Money Ctr., Inc.*, 508 F.3d at 344.

## CHOICE OF LAW

Although these parties do not brief the issue, any federal court sitting in diversity must conduct a choice of law analysis to ensure that it is applying the proper substantive law to the dispute before it.  In undertaking this function, a court applies the conflict-of-laws rules of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Thus, "here, it is apparent that it is Ohio's conflict of laws rules that must normally determine which substantive state law should govern the rights of the parties."  *Ranpak Corp. v. Lopez*, 1:08-CV-0042, 2008 U.S. Dist. LEXIS 90025, at *6 (N.D. Ohio Aug. 12, 2008) (citation omitted).  When a plaintiff asserts multiple claims, it is not necessary for a single jurisdiction's laws to apply to all claims.  *See Moses v. Business Card Express, Inc.*, 929 F.2d 1131, 1139-1140 (6th Cir. 1991) (citing *Caton v. Leach Corp.*, 896 F.2d 939 (5th Cir. 1990)).[5]  Indeed, both Arizona and Ohio law apply to the

---

[5] It appears that the courts of Ohio have never squarely considered whether it is appropriate to apply the law of different jurisdictions to differing claims.  After a careful review of relevant Ohio law, however, this Court believes that the courts of Ohio would reach the same conclusion as those reached in *Moses* and *Caton* – that fundamentally different claims should each be the subject of a careful choice of law analysis.  *See Ohayon v. Safeco Ins. Co.*, 747 N.E.2d 206, 213 (Ohio 2001) (discussing the different considerations when analyzing the choice of law to apply to a contract claim as opposed to a tort claim); *Am. Trim, L.L.C. v. Oracle Corp.*, No. 3:99CV-7265, 2001 U.S. Dist. LEXIS 11027, at *3 (N.D. Ohio 2001) ("Controlling Sixth Circuit precedent determines the issues of whether the forum selection clause applies to both the contract and tort claims."); *Globe Metallurgical v. Hewlett-Packard Co.*, 953 F. Supp. 876, 886 (S.D.

instant litigation.

The Court first considers issues of contract interpretation.  In the instant litigation, all relevant contracts contain facially valid choice of law provisions indicating that Ohio law should apply.  In particular, the Employment Agreement states that it is "governed by the laws of the State of Ohio"  (Doc. 1 Ex. A. at §17) and the APA contains a similar clause, which states that it will be "governed by and construed in accordance with the laws of the State of Ohio applicable to contracts made and performed in such State." (Doc. 32 at §13.5).  Generally speaking, courts defer to the parties' bargained-for intentions with respect to choice of law and courts applying Ohio law are no exception – "where the parties to a contract have made an effective choice of forum law to be applied," an Ohio court will not "contravene [that] choice."  *Jarvis v. Ashland Oil Co.*, 478 N.E.2d 786 (Ohio 1985).  Indeed, the Sixth Circuit has commented that "Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties."  *Ranpak Corp*, 2008 U.S. Dist. LEXIS 90025, at *6 (citing *In Tele-Save Merchandising Co. v. Consumers Distributing Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir. 1987).)

The parties appear to agree that the contractual choice of law clauses are valid and this Court is not aware of any aspect of Arizona public policy that might compel a different result.  Consequently, this Court will apply Ohio law to all questions of contract

---

Ohio 1994) (citing *Moses* with approval when analyzing a case under Ohio law).

To the extent that *Am. Trim* or *Globe* can be read as applying *Moses*, which considered Michigan law, to an Ohio choice of law analysis, this would be incorrect. *Globe* and *Am. Trim* are thus properly understood as implicitly assuming what this Court explicitly concludes today, that Ohio courts would likely employ the same analysis as Michigan courts – not because they must, but because the decisions reached in that jurisdiction are persuasive – and apply a different choice of law analysis to fundamentally different claims.

interpretation.  *See id*. at *6-7 ("[W]here the law of the chosen state sought to be applied is concededly repugnant to and in violation of the public policy of this state, the law of Ohio will only be applied when it can be shown that this state has a materially greater interest than the chosen state in the determination of the particular issue.") (citation omitted).[6]

On the other hand, two claims currently before the Court do not involve written documents at all.  First, Ruffing asserts statutory claims under Arizona employment law.  The Defendants do not dispute that Arizona law indeed governs these claims and the choice of law clause at issue in the Employment Agreement does not compel further analysis.[7]  Second, Ruffing seeks to pierce Masterbuilt's corporate veil.  The parties agree that Ohio law governs this claim.  *Cf. Harlamert v. World Finer Foods, Inc.*, 494 F. Supp. 2d 681, 686 (S.D. Ohio 2006) (applying the law of the jurisdiction in which a corporation has been incorporated to claims against that corporation for wrongfully restricting the manner in which its stock could be transferred).

In summary, then, this Court will apply Ohio law to all questions of contract interpretation, apply Arizona law when considering employment disputes between two parties that do not have a written contract, and will look to Ohio law when determining if

---

[6] The LOI, which is not a contract, does not contain a choice of law provision.  It was, however, a letter from one party in Ohio to another party in Ohio discussing actions to be undertaken entirely in Ohio that is now being evaluated by a district court located within Ohio.  The LOI is, consequently, interpreted under Ohio law.

[7] That clause is quite narrow and impacts only the choice of law analysis when interpreting the Employment Agreement itself.  *Compare* (Doc. 1 at Ex. A §17) ("[This Employment Agreement] will be governed by the laws of the State of Ohio.") *with Moses*, 929 F.2d at 1140 (noting that a choice of law clause stating that it "shall be construed under the laws of the State of California" did not impact the choice of law for issues other than contract interpretation) (citing *Caton*, 896 F.2d 939).

it is appropriate to pierce Masterbuilt's corporate veil.

## ANALYSIS

### A. Ruffing is Entitled to Judgment on the Pleadings with Respect to Count I

Both parties agree that Judgment on the Pleadings is appropriate with respect to Count I, which asks this Court to interpret the Employment Agreement between Ruffing and Masterbuilt.  Neither party disputes that the Employment Agreement attached to Ruffing's complaint governs the parties contractual relationship, nor does either party contend that this Court should look outside the four corners of the Employment Agreement to divine its meaning.  The parties do, however, differ on their interpretations of the relevant contractual provisions.  Ruffing argues that the contract contains a clause governing any termination under the agreement, whereas the Defendants argue that this clause does not extend to the particular type of termination to which Ruffing was subjected.

### 1. Governing Law

Count I asserts that Masterbuilt is in breach of its contractual obligations to Ruffing.  In Ohio, the elements of a common law breach of contract claim such as the one asserted by Ruffing are: "(1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant unlawfully failed to fulfill his obligations, and (4) that damages resulted from this failure."  *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 563 (6th Cir. Ohio 2007) (citing *Lawrence v. Lorain County Cmty. Coll.*, 713 N.E.2d 478, 480 (Ohio App. 1998)).  In the instant case, neither party contests the first two elements of this claim.  The question is whether Masterbuilt breached the contract by declining to pay Ruffing after March 5, 2008 and, if so, what damages resulted from this breach.

When examining a contract governed by Ohio law such as the Employment Agreement, this Court must "presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Seals v. GMC*, No.07-4415, 2008 U.S. App. LEXIS 23949, at *11 (6th Cir. Sept. 7, 2008) (citing *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992)). If the terms of a contract are unambiguous, this Court "will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Holdeman v. Epperson*, 857 N.E.2d 583, 586 (Ohio 2006); *see also Dugan & Meyers Constr. Co. v. Ohio Dep't of Admin. Servs.*, 864 N.E.2d 68, 73 (Ohio 2007) ("[W]here a contract is plain and unambiguous, it does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other, [and] that it is not the province of courts to relieve parties of improvident contracts.") (citation omitted). Indeed, this Court is particularly mindful that "[b]y enforcing contractual language rather than molding it until the outcome looks more fair ex post, courts in the end serve all contracting parties' interests." *PSI Energy v. Exxon Coal USA*, 17 F.3d 969, 974 (7th Cir. 1994) (Easterbrook, J.).

Finally, and of particular relevance to the instant dispute, "[a]n interpretation derived from a reading of the contract as a whole is preferred to an interpretation taken from a reading of a single provision in isolation." *Reardon v. Kelly Servs.*, 210 Fed. Appx. 456, 459 (6th Cir. 2006) (citation omitted); *see also Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859, 892 (S.D. Ohio 2000) ("[A] court must read the contract as a whole and must attempt to give effect to each and every part of it; the court should avoid any interpretation of one part that will annul another part.") (citation omitted); *Foster*

13

*Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519 (Ohio 1997) ("In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain.").

### 2. Interpretation of the Employment Agreement

Masterbuilt contends that the Court need look to only one clause of the Employment Agreement to resolve the instant dispute. It asserts that §2, entitled "Term of Employment and Automatic Renewal," contemplates precisely the situation before the Court today. §2 provides that Ruffing's contract will automatically renew every year, unless one of the parties elects to terminate the Employment Agreement sooner than 60 days prior to the date on which the contract is to renew. (Doc. 24 at 2.) Masterbuilt argues that because §2 "contains no requirement that Masterbuilt compensate Plaintiff for its election to not renew the Employment Agreement," Masterbuilt was not obligated to provide Ruffing with any type of severance.

Masterbuilt does concede that the employment agreement contains a termination clause (§12), but contends that this clause, entitled "Termination," is intended to apply exclusively to situations in which §2 does not. This clause begins by noting that, irrespective of §2's automatic renewal clause, Ruffing's "services shall terminate upon the first to occur of the following events:" (Doc. 1 Ex. A §12.) The clause then lists six situations under which Ruffing's Employment Agreement will immediately terminate, in apparent contrast to §2. (*See id.*)

14

Masterbuilt seizes on this distinction and argue that:

- §2 addresses the end of a given employment period, whereas §12 addresses termination <u>during</u> an employment period.
- the last sentence of §2, which states that "the Employment Period is subject to earlier termination pursuant to [§12]," illustrates that termination under §12 is fundamentally different than termination under §2.
- §2 and §12 contain fundamentally different notice provisions
- §12(d) contains a penalty that is not intended to apply to §2.
- §2 concerns nonrenewal of the "Employment Agreement," which is fundamentally different than §12(d), which concerns termination of the "Employment Period."

(*See* Doc. 24 at 7; Doc. 28 at 2.)  These "five" arguments are all part of the overarching argument advanced by Masterbuilt that §2 addresses one type of situation, whereas §12 addresses another.  (*See id.*)

Masterbuilt's premise is mistaken.  Rather, §2 of the Employment Agreement defines the normal contract term and addresses the manner in which the Employment Agreement can be prevented from automatically renewing by a timely notice of termination, whereas §12 governs the consequences of any termination, including one effectuated by non-renewal.  Despite Masterbuilt's aggressive efforts to characterize §2 as a "non-renewal" provision that is somehow distinct from "termination," §12 very clearly defines the mechanism for "non-renewal" as a termination.  Masterbuilt's proposed distinction is without merit: the parties agreed that the Employment Agreement would not renew when either party provided "written notice to the other party of its election to <u>terminate</u> the contract"  (Doc. 1 Ex. A §2) (emphasis added), and could do so without cause, or even an explanation therefore.  They further agreed, however, that this kind of termination might obligate Masterbuilt to pay Ruffing severance.  The Employment Agreement states:

**[§12(d) Termination by the Company without Due Cause]**

The Company may terminate the Employment Period without Due Cause upon providing the Executive with written notice of such termination. If the Employment Period is terminated pursuant to this Section 12(d)…. Notwithstanding anything to the contrary set forth in [§12(d)], in no event will the Executive receive less than twenty-four (24) months in the aggregate of Base Salary and/or severance pay, as the case may be, under this Agreement…. if the Executive is not in material breach of any of the provisions of [§10]… and has complied with [§12(g)] of this Employment Agreement."

(Doc. 1 Ex. A §12(d)) (emphasis added).  This contractual provisions is straight-forward; there is "no event" in which Ruffing should receive "less than twenty-four (24) months" of total compensation.

While the parties *did* explicitly exclude certain forms of termination from §12(d)'s reach, they did *not* exclude termination under §2.  For example, §12(d) states that it does not apply if Ruffing "breach[es] any of the provisions of [§10]" and §12(e) explains that Ruffing is not entitled to severance if he voluntarily resigns  (*Id*. at 12(d & e).)  That the parties explicitly choose to indicate that §10 and §12(e) were immune from §12(d) further supports the Court's conclusion that §2 is not.[8]

_____

[8]  Masterbuilt's argument that §12(d) only contemplates termination of an "Employment Period" and not the entire "Employment Agreement" is unavailing.  Even if the remainder of §12 were read not to apply to termination of the Employment Agreement under §2 (a conclusion this Court does not reach, for reasons more fully explained below), this particular sentence of §12(d) makes clear that it applies to any termination or departure that is not specifically excluded – breach of §10 or voluntary resignation under §12(e).  This sentence states that "[n]otwithstanding anything to the contrary [regarding termination without Due Cause]" there is "no event" in which Ruffing should receive less than 24 months pay.  This is an exceptionally straightforward contractual provision that applies to any termination of or departure by Ruffing that is not specifically excluded.

Similarly, Masterbuilt's argument that Ruffing's proposed interpretation would somehow have prevented Masterbuilt from terminating Ruffing for cause is unavailing.  (*See* Doc. 28 n.1.)  The contract makes a clear distinction between the requirements for termination with cause and the requirements for termination without cause.

16

Even if §12(d) did not include the above provision, the Court would still reject Masterbuilt's proposed reading of the Employment Agreement because it has the impact of rendering two of §12(d)'s clauses wholly illusory. §12(d) provides for termination "by the Company without Due Cause" and addresses the consequences if Masterbuilt terminates Ruffing: (i) within the first 12 months of employment; (ii) after 12 months of employment, but within the first 24 months of employment; and (iii) after the first 24 months of employment. Each of these provisions requires some payment to Ruffing if he is terminated without Due Cause – payments that could be wholly avoided under Masterbuilt's reading of the contract.[9] On the other hand, Ruffing has suggested an interpretation of §2 and §12(d) that is not only consistent with the plain language of the contract, but that also gives effect to all terms. This is the better interpretation of the contract – this Court will not presume that the parties went to the trouble of spelling out the very detailed provisions of §12(d) without intending them to govern their relationship.[10]

_____

[9] Under Masterbuilt's reading of the contract, termination under §2 will always be less expensive for Masterbuilt than termination under §12(d)(i or ii) and could occur any time during the employment period except during the last 60 days of the Employment Period. The Court does not believe that the parties intended to allow Masterbuilt to escape its severance obligations by characterizing a termination under §2 as a mere non-renewal.

[10] §2 does contain language that is ambiguous when read in isolation. It states that "[n]otwithstanding anything to the contrary contained [in §2], the Employment Period is subject to earlier termination pursuant to [§12]." (*Id*. at §2.) Read without reference to other provisions within the Employment Agreement, this language might well mean that §12 is some entirely different provision of the contract. As explained above, however, such a reading would have the effect of eliminating §12(d) from the contract and should be rejected in light of an equally plausible alternative reading that gives effect to all of the contract's provisions.

### 3. Damages

Given that Ruffing's reading of the Employment Agreement is correct, this Court must still determine the damages to which he is entitled. That determination turns on the meaning of a letter sent to Ruffing on December 17, 2007 – in particular, whether this letter effectively terminated Ruffing pursuant to §2 of the Employment Agreement.[11] In pertinent part, the letter states:

> Pursuant to [§2] of the March 5, 2007 Employment Agreement … notice is given that the Agreement is not being renewed at the end of the initial term, March 5, 2008…. Note, however, that because your employment will cease due to the nonrenewal of the Agreement, the severance described in Section 12(d) when the employment period is terminated without due cause is not triggered.

(Doc. 1 Ex. C.) The question is whether this complies with §2 of the Employment Agreement, which states:

> [The Employment Agreement] will be "automatically … renewed and extended … unless … either party shall give written notice to the other party of its election to <u>terminate</u> this Employment Agreement."

(*Id*. at Ex. A § 2.) (emphasis added).

Ruffing contends that he was never truly terminated by Masterbuilt as required by §2, because the letter to Ruffing explicitly stated that Ruffing was <u>not</u> "terminated without due cause," but rather that the Employment Agreement was "not being renewed." (*Id*. at Ex. C.) In a not-so-subtle reversal of the arguments made when interpreting the impact of a non-renewal under §2, Masterbuilt counters that the plain reading of the sentence that "[your contract] is not being renewed" is that Ruffing's contract was indeed terminated, notwithstanding Masterbuilt's disclaimer of a specific form of termination.

---

[11] This letter was attached to Ruffing's complaint and neither party disputes its authenticity. Consequently, it is appropriate for the Court to consider the letter under Rule 12(c). *In re Commercial Money Ctr.*, 2005 U.S. Dist. LEXIS 45488, at *34-35.

Were it this Court's job to enforce some general notion of fairness, Ruffing's argument would certainly merit consideration.  It seems clear that the Defendants were attempting to sidestep the express intention of the parties and deny Ruffing that to which he was entitled.  It is, however, this Court's job to enforce the contract as written, and interpret the parties communications in light of that writing, not to punish wordsmithing.  *Accord. PSI Energy*, 17 F.3d at 974.  Taken as a whole, the letter served as effective "written notice" of Masterbuilt's "election to terminate" the Employment Agreement, which is all that the Employment Agreement required.  (*Id*. Ex. A §2.)  Consequently, Ruffing is entitled to damages in the amount of **$200,000**, in accordance with the express obligations under §12(d) of the Employment Agreement.  Judgment in that amount shall be entered against Masterbuilt as to Claim I.  Whether any other defendant is also liable for that obligation will be addressed below in connection with the Court's discussion of Count VI.

**B. Red Rock and Hawthorn's Motion to Dismiss Count II is Denied**

Ruffing asserts that Hawthorn and Red Rock violated Arizona labor law §23-353.  This statute provides for triple damages when an "employer" fails to pay an "employee" all wages due to that employee within three working days or the end of the next regular pay period, whichever is sooner.  *See* ARS §23-355.  For purposes of Red Rock and Hawthorn's motion to dismiss, the Court accepts as true Ruffing's well-pled allegation that the Defendants did not even inform Ruffing that they were withholding Ruffing's final paycheck until Ruffing contacted the Comptroller of Red Rock.  (Doc. 1 at ¶54.)  The Court further assumes that Red Rock did not release Ruffing's final check until months after Ruffing's final pay check would have been due, when Ruffing's counsel

19

notified Red Rock that it was in violation of Arizona labor law.  (*Id.* at ¶ 43.)

Red Rock and Hawthorn cannot dispute any of Ruffing's facts at this stage of the litigation, but they do assert that §23-355 applies only to individuals working under a contract of employment.  They correctly note that §23-355 only extends to the situation "[w]hen an employee is discharged from the service of an employer."  ARS §23-355.  Red Rock and Hawthorn then cite to Arizona's statutory definition of employee to demonstrate that Ruffing would not fit this definition with respect to them.  For purposes of ARS §23-355, "'Employee' means any person who performs services for an employer <u>under a contract of employment</u>."  ARS §23-350 (emphasis added).[12]  Red Rock and Hawthorn argue that because Ruffing had no contract with either of them, Ruffing does not state a valid claim against either of these entities.

Ruffing concedes that he did not have a contract of employment with either Hawthorn or Red Rock, but mounts two arguments in opposition their motion.  Ruffing first argues that "because Plaintiff performed services for [Hawthorn and Red Rock] pursuant to his employment agreement, Plaintiff fits the definition of a [Hawthorn and Red Rock] 'employee' under Arizona labor law."  (Doc. 17 at 5.)  Although this argument is not without its appeal, this Court concludes that it is not an accurate statement of Arizona law.  There is simply no basis upon which this Court could appropriately depart from the plain language of ARS § 23-355, which creates a cause of action only when an employee is "under a contract of employment" with a particular employer.

Ruffing also asserts, however, that it is inappropriate to dismiss this cause of

---

[12] Unfortunately, the Arizona courts do not seem to have had the opportunity to interpret the meaning of "employee" within §23-355.

action so long as it may be appropriate to pierce Masterbuilt's corporate veil.  Simply put, Ruffing contends that "[Hawthorn] and [Red Rock] are liable as the alter egos of Masterbuilt."  (Doc. 17 at 5.)  Ruffing asks this Court to extend the case law that indicates a court should not dismiss a breach of contract claim against a party who, although not a party to the contract, would be liable under an alter ego theory.  *See Ypsilanti Cmty. Utils. Auth. v. MeadWestvaco Air Sys., LLC*, No.07-CV-15280, 2008 U.S. Dist. LEXIS 50470 (E.D. Mich. June 30, 2008); *cf. Dombroski v. Wellpoint, Inc.*, 119 Ohio St. 3d 506, 514 (2008) (dismissing a similar claim when piercing would be inappropriate).

The Court agrees that it is appropriate to apply this line of cases to Ruffing's claim.  Indeed, Red Rock and Hawthorn do not contest Ruffing's assertion that these cases provide the controlling legal standard.[13]  This claim is inextricably tied to Plaintiff's assertion that it is appropriate to pierce Masterbuilt's corporate veil – Count II can only be sustained against Hawthorn or Red Rock to the extent that Masterbuilt is the alter ego of Hawthorn or Red Rock.[14]  In other words, should the Defendants at some point succeed in defeating either or both of the piercing claims, this Count would also be dismissed with respect to the successful Defendant(s).  At this stage of the litigation, however, Red Rock and Hawthorn's motion to dismiss Count II with respect to Hawthorn and Red Rock is **<u>DENIED</u>**.

**C. Count III is Dismissed**

---

[13]  The Defendants do, of course, contest that it is appropriate to pierce the corporate veil in this case.  As discussed below, however, this contention is unfounded at this stage of the litigation.

[14]  And, of course, to the extent that Ruffing can sustain a claim against Masterbuilt, which did not move to dismiss Count II.

Count III alleges that Hawthorn is a signatory to a Letter of Intent ("LOI") that names Ruffing as a third-party beneficiary.  Ruffing asserts that the LOI creates the binding obligation on the part of Hawthorn to pay Ruffing an additional year of severance.  (Doc. 1 ¶¶ 8-11, 63-66.)  Ruffing acknowledges that the LOI is not a traditional contract, but cites to Ohio law indicating that "letters of intent or 'agreements to agree' are enforceable <u>when the parties have manifested an intention to be bound by the terms</u>."  (Doc. 17 at 6.) (emphasis added) (citing *Oglebay Norton Co. v. Armco, Inc.*, 556 N.E.2d 515 (1990).  Defendants note that *Oglebay Norton* does not involve a letter of intent and argue that Ohio law does not necessarily recognize agreements to agree.

This Court need not reach the question of whether Ohio law would recognize an agreement to agree, because the LOI attached to Ruffing's complaint states clearly that it does not impose any obligations on Hawthorn.[15]  They correctly point to Ruffing's own cases that note that the myriad cases finding that letters of intent can create binding obligations apply only when the parties actually intend to be bound by a letter of intent.  This LOI contains the opposite directive.  It states:

> This [LOI] is a statement of present intentions … and ***shall not create any right or obligations on the part of the parties***.

(Doc. 1 Ex. A) (emphasis added).  It is clear, therefore, that this particular letter of intent does not create binding obligations on the part of its signatories because, contrary to

---

[15] The Court does note briefly the general principle that two parties create a contract when an agreement between the parties contains all elements necessary to form an enforceable contract (intent to be bound, consideration, definite terms, etc.) and do not create a contract when they do not.  This Court is generally skeptical of distinctions based on what parties may choose to call a document rather than distinctions based on the substance of a document itself.

expressing an intention to be bound by the LOI, the signatories explicitly disclaimed any such obligation.  If the parties have no rights or obligations under the LOI, no rights could flow to any third-party beneficiary, even one expressly identified.

Ruffing responds only by noting that he does not have a copy of the final LOI between the parties and has no way of knowing if this provision survived to the final draft.  (Doc. 17 at 7.)  What Ruffing does not plead, however, is that he has any particular reason to suspect that this language is not in the final LOI between the parties.  Although this Court does accept all well-pled allegations as true, the Court will not presume that a critical provision in the LOI Ruffing attached to his complaint does not represent the final agreement between the parties absent some specific well-pled allegation from Ruffing that this provision was absent from the final agreement.  Defendants' motion to dismiss Count III is **GRANTED**.

### C. Red Rock and Hawthorn's Motion to Dismiss Count IV is Denied

Count IV alleges that Red Rock breached its obligations under the APA.[16] Ruffing contends that the APA compelled Red Rock to offer him employment, because it contained a clause that stated "[Red Rock] shall offer employment to [Ruffing]."  (Doc. 1 Ex. B ¶9.1(a).)  It is undisputed at this stage of litigation that Red Rock did not offer Ruffing employment and that the APA is a binding contract.[17]

---

[16] As previously discussed, interpretation of the APA is governed by Ohio law. Consequently, this Court will apply the same legal standard to Count III as it applied to Count I.

[17] Of course, Defendants may later argue that Masterbuilt's offer of employment fulfilled Red Rock's obligations.  Such an argument would appear to concede the piercing claim asserted in Count IV (and Count V).  The flip side of this coin, of course, is that Ruffing may ultimately prevail on his claim that Red Rock and Hawthorn are really the alter egos of Masterbuilt such that their actions could conceivably relieve

Red Rock and Hawthorn counter that ¶9.1(a) contains an illusory promise and that they were under no obligation to offer Ruffing employment. In support of this contention, they cite ¶9.1(c), which provides that "[n]othing contained in [the APA] ... shall be construed to prevent the termination of employment of [Ruffing] … or any change in the rate of pay or employee benefits available to [Ruffing]." (*Id.* at 9.1(c.).) They assert that "Red Rock's decision to not 'offer' employment to [Ruffing] was nothing more than Red Rock exercising its contractually authorized right to terminate Plaintiff's employment at its discretion." (Doc. 20 at 7.)

The problem with Red Rock and Hawthorn's argument at this stage of the litigation is that courts are hesitant to render any contractual provision illusory when considering a motion to dismiss. While it is possible that the Defendants may bring forth evidence that indicates that their reading of the contract is the most reasonable, the four corners of the document certainly do not compel the conclusion they seek. The Court is hard pressed to think of a clearer contractual obligation than the one at issue here, which clearly states that "[Red Rock] <u>shall offer</u> employment to [Ruffing]." (Doc. 1. Ex. B ¶9.1(a)) (emphasis added). It seems at this point that Ruffing's interpretation of the contract, which gives effect to all of its terms, is the more reasonable one – ¶9.1(c) is intended to apply only to termination "under circumstances that justified a termination, such as … due cause or a change in economic circumstances." (Doc. 17 at 9.)[18]

---

Masterbuilt of some of its obligations.

[18] The parties do not brief, and the Court does not find it necessary to reach, what role the implied duty of good faith and fair dealing may ultimately play in a proper interpretation of the APA. The Court does note, however, that "[m]any cases… place 'good faith' limitations upon the reasons for which an express power to terminate a contract 'at will' can be exercised." *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (Scalia, J.). Indeed, even some contracts far less subject to competing

Additional evidence, of course, may show otherwise.

The Court also notes that, no matter the ultimate interpretation of the contract, Defendants could <u>never</u> have terminated Ruffing by referencing ¶9.1(c) of the APA.  This is because ¶9.1(c) itself does not independently grant Red Rock any power to fire Ruffing.  Rather, ¶9.1(c) simply indicates that ¶9.1(a) does not restrict whatever right Red Rock would <u>otherwise</u> have to terminate Ruffing absent ¶9.1(a).  At this stage, there is no evidence before the Court that could lead it to determine what this power would otherwise have been.  For that reason, the Court cannot dismiss Count IV based on Red Rock and Hawthorn's assertion that Ruffing would not be entitled to damages.  The Court does note, however, that Ruffing must climb a steep hill on this prong to survive summary judgment.

Finally, Red Rock argues that Ruffing waived any rights under the APA by accepting the Employment Agreement with Masterbuilt.  Ruffing characterizes this argument as "insulting," which is not entirely unfair.  It is well-established that waiver is the voluntary relinquishment of a known right. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109 (Ohio 2006).  According to the well-pled allegations in Ruffing's complaint, there was no voluntary relinquishment or similar "choice" exercised by Ruffing.  Ruffing alleges the opposite, that the Defendants orchestrated the deal between Ruffing and Masterbuilt in part to avoid Red Rock's obligation to employ Ruffing.[19]

---

interpretations than the APA - those that expressly provide one party "sole discretion" - do not necessarily allow exercise of that discretion "for any reason whatsoever, no matter how arbitrary or unreasonable."  *Id.* (citation omitted).  The Court is, of course, aware that then-Judge Scalia was not considering Ohio employment law.

[19] Of course, even if Ruffing's complaint did not include the well-pled allegation that he did not voluntarily enter into the Employment Agreement with Masterbuilt as opposed to Red Rock, Red Rock would still have been obligated to offer Ruffing

Red Rock and Hawthorn's motion to dismiss Count IV is **<u>DENIED</u>**.

**D. Red Rock and Hawthorn's Motion to Dismiss Count VI is Denied**

Count VI alleges that Masterbuilt is a mere shell of a company that was never adequately capitalized, did not observe corporate formalities, and was used by Hawthorn and Red Rock to improperly shift their liabilities and to practice acts of deception on others, including Plaintiff. The Court notes that Count VI does not allege an independent cause of action – rather, it seeks recovery from Hawthorn and Red Rock for causes of action that would otherwise only obtain against Masterbuilt. *See Dombroski v. Wellpoint, Inc.*, 879 N.E.2d 225 (Ohio Ct. App. 2007) (rev'd on other grounds). It appears from the complaint, however, that Count VI plays a major role in this litigation, because it requires the Court to determine the precise relationship between the various parties.

**1. Governing Law**

In Ohio, as in most jurisdictions, the corporate form is accorded a great deal of respect. *See, e.g., Music Express Broad. Corp. v. Aloha Sports, Inc.*, 831 N.E.2d 1087, 1092 (Ohio Ct. App., 2005) ("[Ohio] [c]ourts have been reluctant to disregard the corporate entity.") (quoting *E. S. Preston Associates, Inc. v. Preston*, 492 N.E.2d 441, 446 (Ohio 1986)). Courts recognize that "[l]imited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Transition Healthcare Assocs. v. Tri-State Health Investors, LLC*, No. 3:06-CV-2859, 2008 U.S. Dist. LEXIS 23416, at *5 (N.D. Ohio Mar. 25, 2008) (quoting *Anderson v. Abbott*, 321 U.S. 349 (1944)). That said, "[a] court may pierce the veil separating corporations and their shareholders, but will do so only rarely

---

employment. Ruffing would then have been able to choose between employment with Red Rock and employment with Masterbuilt.

26

on a case-by-case basis." *Id.* (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)). The Sixth Circuit has wisely held that "[w]hen a corporation exists solely for the purpose of serving as an alter ego for its owners, the courts will not permit themselves to be blinded or deceived by mere forms or law," instead, the courts should "deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." *Flynn v. Greg Anthony Constr. Co.*, 95 Fed. Appx. 726, 733-734 (6th Cir. 2003) (citation omitted).

Ohio uses a three-prong test to determine whether a plaintiff may disregard the corporate form and hold individual shareholders liable for corporate misdeeds. The plaintiff must establish: (1) the individual shareholders, or any other legal entity exercised such complete control that the corporation had "no separate mind, will, or existence of its own"; (2) this control was used "to commit fraud, an illegal act, or a similarly unlawful act;" (3) the "control and wrong" resulted in "injury or unjust loss … to the plaintiff." *Sanderson Farms, Inc. v. Gasbarro*, No. 07-4252, 2008 U.S. App. LEXIS 22652, at *13-15 (6th Cir. October 24, 2008) (citing *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc., et al.*, 617 N.E.2d 1075 (Ohio 1993); *Dombroski*, 119 Ohio St. 3d 506, 514-15 (2008)).[20]

---

[20] The second prong of this test was recently modified to be less "limited" than the previous test set forth by the Ohio Supreme Court, but more restrictive than the test that was in use by various Ohio intermediate appellate courts. *Compare Dombroski*, 119 Ohio St. 3d at 513 ("[H]aving reviewed the various tests for piercing the corporate veil developed by other authorities, we are convinced that [the second prong of the test we announced in *Belvedere* is] too limited."); *with id*. at 513-14 (veil piercing should not proceed if it alleges only "a straightforward tort" rather than "an exceptional wrong."). This Court will refer to the three elements necessary to pierce the corporate veil as the *Dombroski-Belvedere* test.

A plaintiff who seeks to satisfy the *Dombroski-Belvedere* test by alleging fraud must meet the heightened pleading requirements imposed by Rule 9(b). *Southeast Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6th Cir. 2006) ("When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to [Rule 9(b)]."). Rule 9(b) explains that fraud claims must be plead "with particularity." *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008) (citing Fed. R. Civ. P. 9(b)). Claims of fraud within the Sixth Circuit require that a plaintiff such as Ruffing "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Lifelink Pharms., Inc. v. NDA Consulting, Inc.*, No. 5:07-CV-785, 2007 U.S. Dist. LEXIS 57342, at *5 (N.D. Ohio Aug. 7, 2007) (citing *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).

### 2. Ruffing's Complaint Satisfies the First Prong of *Dombroski-Belvedere*

The first prong of the *Dombroski-Belevedere* test requires Ruffing to properly allege that Hawthorn and Red Rock exercised such complete control over Masterbuilt that Masterbuilt had "no separate mind, will, or existence of its own." *Sanderson Farms, Inc.*, 2008 U.S. App. LEXIS 22652, at *13 (citation omitted). Defendants do not contest this element with respect to Hawthorn, but argue that it is "impossible" for Ruffing to meet this prong with respect to Red Rock because "Ohio law has long recognized that it is *impossible* for… a corporation, to exercise any control over [its sister corporation]." (Doc 13 at 12) (emphasis in original) (citing *Enwotwen Indus., Inc. v. Brookstone Ltd. Partnership*, 157 B.R. 374, 377 (Bankr. S.D. Ohio 1993)).

Red Rock and Hawthorn overstate the holding of *Enwotwen*, which itself contains somewhat problematic language.[21]  The court in *Enwotwen* confronted a situation in which "the only common element" between the sister corporations was the identity of the shareholders.  That court explained:

> [Plaintiff] asserts that '[Defendant A] clearly possessed domination and control over [Defendant B].'  However, there is no evidence to support this bare assertion or even to raise a factual issue…. <u>The only common element</u> between [Defendant A and Defendant B] is the identity of the shareholders of each corporation.  The control asserted by [Plaintiff] simply cannot exist under the existing structural relationship of [Defendant A] and [Defendant B].

*Enwotwen Indus., Inc.*, 157 B.R. at 377-78 (emphasis added).  It is clear, in other words, that *Enwotwen* considered two genuinely separate entities who simply had the same owners.[22]  In stark contrast, Ruffing has alleged that Masterbuilt was merely an instrumentality of Red Rock and that Masterbuilt never had assets, liabilities, products, employees, or even a checking account.

---

[21] That court wrote that "it is impossible [for one sister] corporation … to exercise any control over [the other]."  *Enwotwen*, 157 B.R. at 377.  To the extent that this can be read as stating that merely calling a company a sister corporation on a piece of paper renders control impossible, that is simply incorrect.  True control will not necessarily follow formal ownership.  *See Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982) ("In many instances, the person 'controlling' a close corporation is also the sole, or at least a dominant, shareholder.  In other cases the controlling person may seek to avoid personal liability by not formally becoming a shareholder in the corporation. The question is one of control, not merely paper ownership.").

[22] Moreover, the *Enwotwen* court pointed out that plaintiff's alter ego claim did not even make sense, as the plaintiff sought to pierce through the company that was allegedly dominating the subservient company, rather than the other way around.  *See Enwotwen*, 157 B.R. at 378.  Ruffing, conversely, seeks to pierce the company allegedly being dominated.

29

Ruffing supports his position with a recent case from an Ohio court of appeals.  In that case, the court squarely held that ostensible corporate structure is irrelevant and that the dispositive issue is control:

> Whether one is attempting to pierce the corporate veil by holding individual shareholders liable or by holding a related company liable under alter-ego principles is a distinction without a difference.  In either case, the question [is control, not ownership].

*Minno v. Pro-Fab*, 2007 Ohio 6565, P44 (Ohio Ct. App. 2007).  Ruffing argues that this court should not allow Red Rock to perpetrate a fraud though Masterbuilt simply because Red Rock is not listed on paper as the owner of Masterbuilt.

The Court believes that Ruffing is correct.  Although it will be in only the rarest and most extreme cases that one sister corporation can truly be said to control another, Ruffing has alleged sufficient facts to proceed to discovery.  The Court notes, however, that the Supreme Court of Ohio is currently reviewing *Minno* and may ultimately conclude that ownership, rather than control, is the defining question.  *See Minno v. Pro-Fab*, 885 N.E.2d 954 (Ohio 2008).  It is, of course, the exclusive province of that court to determine Ohio law.  Consequently, irrespective of the Court's ruling today, this Court will dismiss this count against Red Rock if the Supreme Court of Ohio determines that *Dombroski-Belvedere* applies only to cases of actual ownership.

### 3. Ruffing's Complaint Satisfies the Second and Third Prongs of *Dombroski-Belvedere*

Red Rock and Hawthorn do not contest that Ruffing has properly pled the second and third prongs of *Dombroski-Belvedere*.  The second prong requires Ruffing to allege that Hawthorn and Red Rock used their control over Masterbuilt "to commit fraud, an illegal act, or a similarly unlawful act" and the third prong requires Ruffing to allege that

he suffered an "injury or unjust loss" as a result of the "control and wrong." *Sanderson Farms,* 2008 U.S. App. LEXIS 22652, at *13-15.

Nevertheless, because neither party had the opportunity to brief the potential impact of *Dombroski*, this Court considers it important to note that Ruffing has properly pled this element of his claim.  The Court takes note of Ruffing's specific allegations that despite having a contract that was ostensibly with Masterbuilt, Ruffing was always paid by Red Rock, that Masterbuilt (the company with whom he signed a contract) was not "real," and that various aspects of the contract appear to be fraudulent to the extent that Masterbuilt was a company with no assets, liabilities, products, or employees (other than Ruffing).  This is more than enough particularity to satisfy the heightened pleading requirements for a claim of fraud.

### 4. The *Dombroski-Belvedere* Analysis Applies to Limited Liability Companies

Without any case law to support them, Red Rock and Hawthorn argue that piercing law does not apply to limited liability companies.  Their argument stems solely from the limited liability statute, which, according to them, states that the members of a limited liability company are not liable for the debts of the company.  Red Rock and Hawthorn, however, miss the key word in the statute. The relevant provision states that the members and managers of an LLC are not personally liable for the debts of the company "**solely** by reason of being a member or manager of the limited liability company." Ohio Rev. Code § 1705.48(B)  (emphasis added).  Thus, contrary to their suggestion, the statute does not state that no one other than the LLC can be held liable for the LLC's debts; it merely states that members and managers are not personally liable just because they happen to be a member or manager.

31

This concept is not unique to LLCs. Indeed, the officers and shareholders of a corporation are not ordinarily liable for the debts of the corporation just because they work for or own shares of the corporation. *See, e.g., Sanderson Farms*, 2008 U.S. App. LEXIS 22652. Yet, under the proper circumstances, they can be held liable if the limited liability of the corporation is pierced. The same is true for LLCs. While the LLC is a relatively new type of entity under the law, many courts have already recognized that they are subject to the same analysis as corporations. *See, e.g., Ypsilanti County Utils. Auth. v. MeadWestvaco Air Systems, LLC*, 2008 U.S. Dist. LEXIS 50470, n.3 (E.D. Mich. June 30, 2008) (recognizing that case law in both the district and Michigan have applied piercing claims against limited liability companies); *Meccatech, Inc. v. Kiser*, 2008 U.S. Dist. LEXIS 30829 (D. Neb. Apr. 15, 2008) (assuming that an LLC's corporate veil can be pierced in Nebraska); *BLD Prods., LTC v. Tech. Plastics of Or., LLC*, 2006 U.S. Dist. LEXIS 89874, at *7-8 (D. Or. Dec. 11, 2006) ("[T]he piercing doctrine may be applied to LLCs under the same circumstances in which it is applied to corporations."); *Filo Am., Inc. v. Olhoss Trading Co*., L.L.C., 321 F. Supp. 2d 1266, 1270 (M.D. Ala. 2004) (allowing a claim to pierce an LLC in Alabama); *Teasck v. Gilbert*, 2007 BNH 11 (Bankr. D.N.H. 2007) (same result in New Hampshire). Indeed, Red Rock and Hawthorn do not cite a single case that has ever differentiated an LLC from a corporation for purposes of veil piercing and there is no reason to believe that Ohio would reach such a unique result. Accordingly, Red Rock and Hawthorn's motion to dismiss Count VI is **DENIED**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Ruffing's motion for judgment on the pleadings with respect to Count I, **DENIES** Masterbuilt's cross-motion for judgment on the pleadings with respect to Count I, **GRANTS** Red Rock and Hawthorn's motion to dismiss Count III, and **DENIES** Red Rock and Hawthorn's motion to dismiss Counts II, IV, and VI.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: January 23, 2009**

33